# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

|  |  |
|---|---|
| CLUBHOUSE TRAILER CO., LLC, and FORWARD PERFORMING ARTS, INC. on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>REGAL REXNORD CORPORATION and THOMSON INDUSTRIES, INC.,<br><br>               Defendants. | Case No.<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. PARTIES, JURISDICTION, AND VENUE ...................................................... 3

Plaintiff Clubhouse Trailer Co., LLC ............................................................ 3

Plaintiff Forward Performing Arts, Inc. ...................................................... 13

Defendant Thomson Industries, Inc. ............................................................ 15

Defendant Regal ........................................................................................... 16

Jurisdiction and Venue ................................................................................. 17

III. FACTUAL ALLEGATIONS ............................................................................ 18

Electrak HD Background .............................................................................. 18

The Defect .................................................................................................... 21

Defendants Market the Electrak HD ............................................................ 23

Defendants Omit the Defect, Cease Distribution of the Electrak HD, and Release the Electrak HD 2 ............................................................................ 27

The Plaintiffs Have Been Injured ................................................................ 28

Defendants Breached Express Warranties ................................................... 29

Defendants Breached their Implied Warranty of Merchantability .............. 31

IV. TOLLING OF THE STATUTE OF LIMITATIONS ....................................... 32

Discovery Rule Tolling ................................................................................. 32

Fraudulent Concealment Tolling ................................................................. 32

Estoppel ........................................................................................................ 33

V. CLASS ALLEGATIONS ................................................................................... 33

Class Definitions .......................................................................................... 33

Numerosity ................................................................................................... 35

Commonality ................................................................................................ 35

Typicality ...................................................................................................... 36

Adequacy of Representation ......................................................................... 36

Superiority/Predominance ............................................................................ 37

Requirements of Federal Rule of Civil Procedure 23(b)(2) ........................ 38

VI. CLAIMS FOR RELIEF .................................................................................... 38

ii

COUNT I: VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT .................................................................................... 38

COUNT II: BREACH OF EXPRESS WARRANTY ........................................... 42

COUNT III: BREACH OF IMPLIED WARRANTY ........................................... 45

COUNT IV: UNJUST ENRICHMENT .............................................................. 47

COUNT V: VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT .. 49

**PRAYER FOR RELIEF** ............................................................................................ **53**

**DEMAND FOR JURY TRIAL** ................................................................................. **55**

iii

Plaintiffs Clubhouse Trailer Co., LLC ("Clubhouse") and Forward Performing Arts, Inc. (collectively, "Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated against Defendants Regal Rexnord Corporation and Thomson Industries, Inc.

## I.    INTRODUCTION

1.      Plaintiffs bring their claims individually and on behalf of all persons or entities in the United States who purchased Thomson Electrak HD electric linear actuators.

2.      Defendants Regal Rexnord Corporation and Thomson Industries, Inc. are leading manufacturers of linear motion control products, devices designed to automate movement in straight lines. Thomson is a brand of Regal Rexnord Corporation and operates as part of Regal's Linear Motion Division.

3.      Linear motion control products are used across industry—spanning industrial automation (e.g., packaging and assembly) to medical devices (e.g., scanners and beds) to transportation (e.g., trucks, tractors, and planes). One of the linear motion control products manufactured by Regal and Thomson is the Electrak HD actuator.

4.      The Electrak HD is an electric linear actuator, a modern device that replaces hydraulic and manual lift systems to push, pull, or rotate an object with electrical energy, usually performing such tasks on extremely heavy loads. An actuator is, in effect, a motor that moves objects or machinery in a straight line.

5.      Electrak HD actuators are specifically designed to operate in synchronized pairs or groups, intended to maintain coordinated motion regardless of weight imbalances. For example, Regal and Thomson widely market the Electrak HD's intended synchronization features, advertising that synchronization allows users to "easily conquer . . . heavier loads" and the "unforeseen obstacle of actuating uneven loads."

1

6.      But the Electrak HD actuators have a fundamental design defect. The actuators do not truly synchronize during motion. When one actuator encounters resistance and stops, the obstructed device does not communicate a stop command to its paired actuator. The non-faulted actuator continues moving uncontrollably until it reaches its own overload limit or end of travel—a condition Defendants themselves have called a "runaway actuator" defect.

7.      It is a basic engineering and safety principle that a system's failure should result in the system stopping entirely. The Electrak HD actuator fails to comply with this standard. Instead, when one Electrak HD actuator stops in the event of a failure, the other continues to travel until either a loss of power or it reaches end of travel or its own overload limit. As a result, these actuators—with their immense power—can warp metal objects, shatter heavy glass, and leave users unable to halt a runaway actuator.

8.      This defect causes significant physical damage to equipment, creates dangerous safety hazards, and leaves operators unable to stop the uncontrolled motion even by releasing the control switch. They also render Defendants' advertising that the Electrak HD offers synchronized operation misleading—the Electrak HD actuators fail to synchronize and do not move in unison.

9.      Consumers have notified Defendants about this defect. Nonetheless, it took Defendants years to finally address the failure by releasing a new product—all the while allowing consumers to shoulder the cost of the product failure. Rather than immediately addressing the defect, Defendants continued to design, manufacture, and sell the defective Electrak HD; failed to inform consumers of the defect; and took no action to correct the problem.

10.      Instead of issuing a recall or warning consumers, Defendants continued to manufacture, market, and sell the defective Electrak HD actuators while representing that they provided reliable synchronized motion. When Defendants finally developed a replacement product

2

in 2025—the Electrak HD with a "Sync 2.0" upgrade ("Electrak HD 2") promising "true synchronization"—they refused to replace the defective Electrak HD units they had sold and instead have attempted to charge customers for the upgraded product.

11. The defect is material. Consumers paid a premium for actuators marketed as providing synchronized motion that would keep paired actuators "moving together regardless of the load imposed." The defective actuators fail to perform this essential function.

12. Because of the defect and Defendants' misrepresentations and omissions, Plaintiffs and the Class Members overpaid for the Electrak HD actuators, suffered physical damage to their equipment, incurred substantial service and replacement costs, and were forced to bear the expense of Defendants' defective design.

## II. PARTIES, JURISDICTION, AND VENUE

**Plaintiff Clubhouse Trailer Co., LLC**

13. Plaintiff Clubhouse Trailer Co., LLC, is an Oklahoma company with its principal place of business at 14625 Santa Fe Crossing Drive, Edmond, Oklahoma 73013. Clubhouse's sole member resides in—and is a citizen of—Oklahoma.

14. Clubhouse is an industry leader in marching band logistics. Clubhouse specializes in designing and manufacturing custom band equipment trailers. Founded in 2010, the company has built nearly 350 trailers, serving more than 87,000 students across 23 states.

15. Clubhouse's trailers offer high-tech performance for schools, band camps, and others in the marching arts. One of Clubhouse's trailers is pictured here:

3



16. Around September 2019, Clubhouse and Thomson began communicating about the possibility of using Electrak HD linear actuators to synchronize movement in its trailers.

17. Thomson suggested the Electrak HD, stating that this actuator "sound[ed] like a great fit" for Clubhouse trailers. Thomson specifically approved of Clubhouse's use and engineering. Clubhouse ultimately decided to purchase—and design its trailers to accommodate—the Electrak HD actuators.

18. Defendants promoted the success of Clubhouse's application by publishing a case study encouraging consumers to switch from using hydraulic cylinders to the Electrak HD to "eliminate[] undesirable" ramp movement during travel or active loading and prevent "spending many hours" on installation. The case study stated that the Electrak HD "ensure[d] consistent and synchronized movement":

4

**Smooth moves**

The Electrak HD's onboard electronics, combined with CAN bus networking, ensure consistent and synchronized movement of the ramp actuators. (Figure 2)

"As the ramp deployment starts, the segments have to kick out to get things started and then flatten out over the move," said Hadley. "With the hydraulic cylinders, each operates independently, so if there is any shifting of variation in the cylinder performance itself, you run the risk of the ramp buckling or twisting. The Thomson synchronization software harmonizes actuator operation, telling each actuator when to move to maintain balance. The same thing happens when it comes back up, and overall, the synchronization feature speeds up the whole ramp operation."



*Figure 2.* The synchronization feature of the Thomson Electrak HD helps coordinate smooth, safe and quick ramp operation.

19. Clubhouse began purchasing Electrak HD actuators in 2020 for its trailers, and it has used the Electrak HD actuators in its power-ramp system. In its ramps, Clubhouse installs two pairs of Electrak HD actuators which are intended to each work in synchronization:

    a. **Main Electrak HD actuators ("Main" or "Mains")**: Clubhouse installs a pair of Mains designed to work in synchronization to roll out the main part of the ramp.

5

b.  **Fold Electrak HD actuators ("Fold" or "Folds")**: Clubhouse uses a pair of Folds designed to work in synchronization to extend the length of the ramp.



20.     In short, the Main units are used to move the ramp out of the trailer, while the Fold units are used to open and fold the ramp's midsection. Clubhouse decided to use the Electrak HD actuators because Defendants advertised that paired units work in synchronization.

21.     But the Electrak HDs do not work in synchronization. In particular, when one actuator encounters excessive force and halts (or otherwise fails), the paired actuator continues to extend or retract uncontrollably. Further, when an operator pulses the controller for short bursts of movement, the primary actuator will often stop without communicating the stop command to the subordinate actuator, leading the subordinate actuator to continue moving.

22.     This defect warps Clubhouse's heavy duty metal ramp system and leaves the ramp inoperable, often leaving an entire marching band without reliable transportation to travel to or home from band performances and competitions. Many times, the failure also results in irreparable damage to the actuator itself. Examples of the effects of the defect are pictured below:

6





7



Bent Electrak HD

23. Clubhouse has also used the Electrak HD actuators for other applications. In at least two of its trailers, Clubhouse has additionally installed a power-lift platform system: a four-set of Electrak HD actuators ("Lifts") that are intended to work in synchronization to raise and lower an interior storage platform floor inside the trailer. The four actuators are designed to work together to provide coordinated vertical movement of the platform floor.



8



24.     Clubhouse was unaware of the defect when it purchased the Electrak HD actuators. Clubhouse had seen Defendants' representations about the synchronization functionality, reliability, and quality of the Electrak HD and believed that Defendants would provide actuators that could maintain synchronized motion as advertised.

25.     Defendants never disclosed the defect to Clubhouse prior to purchase, including when Clubhouse requested technical specifications or when Clubhouse notified Defendants about the defect. In fact, Defendants' engineers explicitly approved Clubhouse's wiring diagrams and application, going on to publish a case study featuring Clubhouse's use of the Electrak HD.

26.     Believing that the Electrak HD actuators supported synchronized movement, Clubhouse purchased multiple Electrak HD actuators and designed its trailers specifically for use with the Electrak HD.

9

27. But the Electrak HDs have consistently failed. Clubhouse has experienced continuous failures resulting in twisted ramps, bent actuators, stranded customers, and substantial financial losses.

28. Clubhouse repeatedly notified Defendants of Electrak HD failures. In one instance, for example, Clubhouse told Defendants: "Whether the [primary] or the [subordinate] actuator that faults, the supposed 'Stop' command is either not sent by the faulting actuator or is not received by the unrestricted actuator." On another occasion, Clubhouse reported: "We have ANOTHER trailer in the field that the actuators DO NOT sync or communicate a STOP command during operation. One actuator stopped because of loading and the other continued extending."

29. Over multiple years, Clubhouse sent dozens of emails to Defendants complaining about the synchronization failures and asking for help. Despite these complaints, Defendants failed to respond adequately, failed to issue a recall, and failed to replace the defective units. Instead, they repeatedly promised solutions to correct the failure, which never materialized.

30. In response to Clubhouse's reported actuator failures, Defendant Thomson represented:

> If one actuator in a [synchronized] group experiences an overload, it will sen[d] out a STOP signal to the other units in the group.
>
> So, commands will be sent to actuators at the following times:
> - Master commanded GO
> - Master commanded STOP
> - ANY actuator reaches overload

31. In practice, commands between the primary and subordinate actuator are not consistently sent in an overload state. A go or stop command may not be issued by either the primary or subordinate actuator to the other during an overload. In response to Clubhouse's

concerns about this issue, an application engineer from Defendants eventually noted: "There is discussion that perhaps there was an error in the communication bus."

32.     Around November 8, 2023, Defendants arranged an in-person visit to Clubhouse's facility to inspect the Electrak HD failures. The inspection included a complete review of the electrical circuits.

33.     Plaintiff Clubhouse summarized the inspection in an email sent to Defendants, stating:

> [T]hrough multiple conversations with the group it sounds like the actuators function as Thomson expects them to function - fail in a full on, full travel condition with no way the operator can stop the motion. This is crazy. Because of this condition, a run-away actuator typically causes damage to the actuators and strands the band program with a non-functional ramp in a parking lot somewhere. ***Again, this is not what we expected or what was promoted to us by Thomson in 2020.*** Our requests throughout our meetings and communications since 2020 has been for Thomson to rectify this failure mode so the actuators actually stop together if one reaches a load current fault. We have proven it is not a communication cable signal issue - it is an actuator fault recovery issue. (emphasis added).

34.     As its actuators failed, Clubhouse sent its defective Electrak HD actuators to Defendants for inspections, repairs, and replacements. Defendants charged Clubhouse $75 each time it sent a defective actuator back to Defendants for inspection and repair, only for Defendants to report that the actuators were unrepairable. Defendants continued to charge Clubhouse for replacements, rather than bearing the cost of the defect.

35.     Despite receiving continuous complaints about synchronization failures, Defendants never disclosed the defect to consumers. Instead of acknowledging the inherent design defect, Defendants falsely suggested the problems (including Clubhouse's) were caused by customer application errors, electrical issues, or operator mistakes.

36.     When Defendant sales representatives working with Clubhouse voiced concerns to Defendants about issues with the Electrak HD, those employees were subsequently prevented from

attending meetings to discuss resolutions. On at least one occasion, one of Defendants' employees stated to Plaintiff Clubhouse on the phone that the Electrak HD 2 was being designed to resolve issues with the original Electrak HD. Defendants have since prevented that employee from speaking with Clubhouse, repeatedly removing him from any correspondence with Clubhouse.

37. As of June 2, 2023, Clubhouse has purchased over 300 Electrak HD actuators, comprised of main, fold, and lift actuator units, deployed in their trailers (including an order on that date). At least 46 actuators failed, 32 mains and 14 folds, costing Clubhouse over $150,000 in repair costs on the electric linear actuators that Defendants represented were "synchronized" and "designed to be maintenance-free."

38. Each time the Electrak HD actuators failed, Clubhouse shouldered the responsibility of troubleshooting the defective actuators. This included nearly forty phone calls to talk customers through repairing their trailer ramps—calls which often occurred between 10:30 p.m. to 1:00 a.m. as a stranded customer attempted to get its student band and its equipment ready to attend an event or travel back home after.

39. The burden on Clubhouse also included at least twelve trips out of state, ranging from eight to twenty-six hours driving, to personally repair the failed actuators—while a trailer was left open overnight because the out-of-sync actuator would not move in any direction.

40. Clubhouse likewise shouldered the burden of purchasing multiple replacements for defective actuators and damaged trailer parts at Clubhouse's own expense.

41. Rather than resolving the issues or disclosing the defect to consumers, Defendants instead created a new version of the actuators in 2025 (the "Electrak HD 2"). Instead of replacing the defective units previously sold to Clubhouse, they stated that Clubhouse would have to purchase Electrak HD 2 units to replace their defective actuators.

42. According to Defendants, the cost of replacing the units would be Clubhouse's responsibility, costing over $100,000. Still, Defendants refused to admit liability, telling Clubhouse the offer to buy a replacement product did "not constitute an admission of fault or liability regarding the [Electrak HD] product."

43. Had Clubhouse known of the defect, it would not have purchased the Electrak HD actuators or would have paid significantly less.

**Plaintiff Forward Performing Arts, Inc.**

44. Plaintiff Forward Performing Arts, Inc. ("Madison Scouts") is a non-profit organization incorporated in Wisconsin with its principal place of business in Madison, Wisconsin.

45. Forward Performing Arts, Inc. operates and does business as Madison Scouts Drum and Bugle Corps, one of the country's premier competitors in the marching arts.

46. Every summer, the Madison Scouts select around 160 student applicants, ages 18 to 21 years old, to participate in a 9,000-mile tour across the country to provide performing arts education and marching band performances.

47. Each year, from mid-May to mid-August, the Madison Scouts provide educational clinics and performances across the country, driving overnight from location to location. The Madison Scouts aim to be as self-sufficient as possible on the road, toting all the necessary equipment, supplies, and even food when possible.

48. To transport their valuable musical instruments and equipment, the Madison Scouts employ a Clubhouse trailer equipped with Electrak HD actuators. Heavy audio equipment is likewise stored in a single band trailer. Due to the weight of this equipment, the Madison Scouts cannot manually remove it from the stairs and rely completely on access to the ramp.

13

49. The Madison Scouts initially chose Clubhouse Trailers to move away from a manual ramp system, which was dangerous for staff and for students.

50. Electrak HD failures cause major setbacks for the Madison Scouts. They store all the band equipment in a single trailer, and they do not have a backup option for their daily transportation needs when the Electrak HDs fail. Moreover, the Madison Scouts' schedule requires them to change locations daily—they cannot take a day off while repairs are underway.

51. Their inability to open the trailer ramp can prevent the Madison Scouts from performing as scheduled at a venue which in turn, results in the Madison Scouts missing out on revenue it would have received for its performance.

52. As a small, non-profit organization, the Madison Scouts rely on these payments to maintain their operation. The Madison Scouts develop their annual budget based, in part, on payments it will receive from performances.

53. The setbacks caused by the Electrak HD failures are felt beyond Madison Scouts itself. The failures also impact the Madison Scouts' ability to provide a quality and fulsome program to the participating students who pay to participate in this program.

54. The Madison Scouts' trailer is specifically designed for use with Thomson Electrak HD actuators. Switching to another electric linear actuator would require the Scouts to purchase not just replacement parts but redesign its trailer.

55. The Madison Scouts have placed multiple calls to Clubhouse due to actuator failures and have had to replace multiple pairs of synchronized actuators. The Main actuators were first replaced on June 13, 2023. The Main actuators were again replaced in June 2025. The Madison Scouts finally changed their Mains again in April 2026 with a set of Electrak HD 2s. The

Madison Scouts have also purchased an additional set of Electrak HD 2s for use as Fold actuators. These Folds will be installed in July 2026.

56. The Electrak HD failures have caused the Scouts' organization to suffer and its student participants to suffer.

57. The Madison Scouts was unaware of the defects in the Electrak HD actuators when it purchased its band trailer.

58. Had the Madison Scouts known of the defect, it would not have purchased the Electrak HD actuators or would have paid significantly less.

**Defendant Thomson Industries, Inc.**

59. Thomson is a Delaware corporation with its principal place of business at 2400 Curtiss Street, Downers Grove, Illinois 60515.

60. Thomson is one of the leading manufacturers of linear motion control products, including the Electrak HD electric linear actuators at issue in this action.

61. Thomson is a subsidiary of Regal Rexnord Corporation and has been since its merger with Regal in 2023. The Thomson logo prominently reads "Thomson, A Regal Rexnord Brand."

62. At all relevant times, Thomson, directly or through its agents, manufactured, distributed, warranted, sold, and serviced the Electrak HD actuators throughout the United States. Thomson also, directly or through its agents, marketed and promoted the sale of the actuators throughout the United States.

63. Thomson approved the defective Electrak HD actuators and approved and publicized advertisements and marketing materials designed to sell the actuators. Thomson specifically authorized, encouraged, and promoted the synchronized use of the Electrak HD for

Clubhouse trailers, writing a case study and promotional articles prominently displayed on its website. Thomson sold and advertised the defective Electrak HD in all fifty states, including Wisconsin.

**Defendant Regal**

64. Defendant Regal Rexnord Corporation is a Delaware corporation with its principal place of business and headquarters located at 111 West Michigan Street, Milwaukee, Wisconsin 53203. Regal is registered as a domestic business in Wisconsin.

65. Regal is a global corporation that engineers and manufactures industrial solutions, power components, and electrical motors and controls. Regal holds itself out as a "leading manufacturer of . . . power generation and power transmission products."

66. In March 2023, Regal completed the acquisition of Altra Industrial Motion Corporation, which included Thomson. This acquisition brought Thomson's linear motion products into the Regal Rexnord portfolio as part of Regal's Automation & Motion Control segment.

67. Regal advertises that Thomson is in its "family of brands." Regal is Thomson's parent company.

68. Since the 2023 Merger, Regal, directly or through its agents, manufactured, distributed, warranted, sold, and serviced the Electrak HD actuators throughout the United States and in this District. Regal also, directly or through its agents, marketed and promoted the sale of the Electrak HD actuators throughout the United States and in Wisconsin.

69. Regal actively markets Thomson products as part of its own portfolio. Regal publishes brochures, for example, promoting Thomson Electrak HD actuators, stating that these

16

products are "engineered with efficiency and reliability in mind" and "provide years of dependable service in these challenging applications."

70. Regal showcases Thomson linear actuator products at various trade shows.

71. At all relevant times, Regal, directly or through its agents and subsidiaries, manufactured, distributed, warranted, sold, and serviced the Electrak HD actuators throughout the United States and from Wisconsin.

**Jurisdiction and Venue**

72. This Court has subject matter jurisdiction over this case under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d). Members of the proposed class are citizens of states other than Regal and Thomson's home states. The total amount in controversy exceeds $5,000,000 exclusive of interest and costs, and there are hundreds of putative class members. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to the extent any of the Plaintiffs' claims fall outside this Court's original subject matter jurisdiction.

73. This Court has personal jurisdiction over Regal under Wisconsin Statutes § 801.05(1)(d) because Regal is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise. Regal is incorporated and headquartered in Wisconsin. Regal's affiliations with this state are thus so continuous and systematic such that Regal is essentially at home in Wisconsin.

74. This Court has personal jurisdiction over Thomson under Wisconsin Statutes § 801.05(3) because persons or property within or without this state suffered injuries arising out of Thomson's acts or omissions within this state. Thomson's parent company Regal is headquartered in Wisconsin, and Thomson's marketing and promotional activities, including

17

misrepresentations about the Electrak HD actuators, were controlled, established, and disseminated from Wisconsin through Regal's corporate operations.

75. Thomson has significant contacts with Wisconsin through its relationship with Regal. Since the 2023 Merger, Thomson operates as a Regal Rexnord brand, uses Regal Rexnord business systems, and its employees use Regal Rexnord email addresses. Thomson purposely avails itself of the benefits of the state. Indeed, Madison Scouts purchased its Electrak HD actuator from Wisconsin and its Electrak HD actuator has failed in Wisconsin.

76. Venue is proper in this forum under 28 U.S.C. § 1391 because Regal resides in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

77. All conditions precedent to this action have occurred, been performed, or have been waived.

### III.    FACTUAL ALLEGATIONS

**Electrak HD Background**

78. Consumers use electric linear actuators like the Electrak HD to efficiently manage heavy loads or reduce the physical burden of manual lifting, such as opening a motorized skylight, reclining a power sofa, or lowering a ramp. Consumers also use actuators like the Electrak HD to provide coordinated movement at multiple pressure points through synchronized mechanisms.

79. An electric actuator is a motorized device that converts electrical energy into controlled mechanical force to push, pull, or rotate an object, providing a clean and precise alternative to hydraulic and manual systems for any application requiring the automated movement of a load.

18

80. Rather than using air, oil, or water pressure, an electric actuator generates movement with an electric motor. The movement is directed from a main controller which sends simple electrical commands to facilitate movement.

81. Regal and Thomson advertise that the Electrak HD is "a popular choice for applications where hydraulic cylinders were traditionally used." According to Regal and Thomson, "[t]here are many reasons to switch from a . . . hydraulic actuator solution to an electric one," including "[b]etter controllability" and "better performance."

82. Certain electric actuators are labeled as linear because they use an internal screw mechanism to transform the motor's spinning motion into a straight-line "stroke" that moves a load back and forth along a single path.

83. Electrak HD actuators are electric linear actuators designed to operate in synchronized pairs or groups, purportedly maintaining coordinated motion regardless of load variations.

84. The synchronization feature in the Electrak HD is achieved by embedding technology into one main actuator, which can then be wired to secondary actuators. This feature allows consumers, according to Defendants, to "synchronize [actuators] instantly by wiring them together and operating a single unit with a simple switch."

85. The Electrak HD's synchronization feature should work continuously. As Thomson has explained, "[d]uring operation, system electronics detect speed changes that indicate load imbalances, thereby eliminating bouncing or other effects of imbalance." Thomson markets that "synchronization increases system movement speed more efficiently."

86.     Defendants marketed the synchronous control feature as a thoroughly tested control mechanism that would allow for up to eight actuators to work in unison—promising to "add even more control and power":



## Add Even More Control and Power with the Synchronization Option

Electrak® HD's control features undergo thorough testing at Thomson to ensure your machines are prepared for countless application challenges – both expected and unexpected. With the synchronization option, machine designers are able to easily conquer not only heavier loads but the sometimes unforeseen obstacle of actuating uneven loads as well.

Electrak® HD

## Synchronization Applications

**Door/Hatch Lifts**

**Assembly Stations**

Utilizing synchronization for mobile lifting platforms on vehicles provides a robust, reliable solution without the complexity and maintenance requirements of a traditional hydraulic solution.

Placing the Electrak HD with synchronization into your ergonomic applications ensures a stable, effective lift for off-center or awkward loads.

87.     The synchronization function on the Electrak HD is essential to ensuring convenience and safety for movement of extremely heavy objects. As to convenience, without an

electric linear actuator, consumers would have to manually raise and lower objects, often at weights heavier than an individual has the strength to handle. Electric linear actuators also eliminate the need for using hydraulic actuators which are not capable of synchronized motion. Consumers would also need to enlist help of multiple individuals to generate the coordinated movement required to lift extremely heavy objects.

88. As to safety, electric linear actuators replace the need for manually lifting objects with weight that could topple humans, leading to serious injury or even death. Actuators can be particularly important for those operating heavy machinery—where the strength required to manipulate an object exceeds human capacity and workplace safety guidelines. Additionally, electric linear actuators protect machinery which could be damaged by the improper handling of uneven weight distributions.

89. An Electrak HD manual promises:

> Safety comes first. Each HD electric linear actuator is equipped with the Electronic Monitoring Package, which will constantly monitor critical parameters and take appropriate action as needed. Each unit will reset automatically when conditions return to normal, allowing for operation to continue.

**The Defect**

90. The Electrak HD contains a fundamental design defect in its synchronization feature.

91. Defendants marketed the Electrak HD to work in synchronization with up to eight other units to power the movement of extremely heavy objects, regardless of the load imposed. Electrak HD promotional materials emphasize the actuators' ability to keep movement uniform even when load weight varies between actuators.

92. To effectuate movement, an Electrak HD actuator is sent a go command from a controller (such as a handheld remote, a mounted panel, or an industrial Programmable Logic

21

Controller). A human operator initiates the go command by pushing a button on the controller. The controller is connected to one actuator via a wire, and the go command initiates movement of all connected actuators which continues until the operator releases the button, stopping the go command.

93. In Electrak HD pairs configured for synchronization, the controller is connected to a primary actuator via a wire then another wire connects the primary actuator to a second, subordinate actuator. When the primary gets the go command, it interprets this command and then sends a go command to the subordinate. Movement should continue in both as long as the go command is enacted. When the go command ends, the primary communicates to the subordinate to stop.

94. In synchronized actuators, two occurrences should effectuate a stop. First, when the operator ceases pressing the go command, movement should stop in both the primary and subordinate actuator. Second, if any individual actuator overloads, meaning it exceeds operational capacity, Defendants represented that the synchronization feature contained protective functions that would signal all synchronized actuators to stop were an issue to arise.

95. The Electrak HD can fail to stop in both instances. As to synchronized movement that should stop when the operator releases the go command, a failure can occur when an operator pulses the controller for short bursts of movement, resulting in the primary actuator stopping without communicating the stop command to the subordinate actuator. When this failure occurs, one half of a synchronized pair of actuators stops moving and the other continues to move.

96. As to synchronization through overloads, the Electrak HD manual states: "[i]f one actuator encounters an overload condition, it will trip the overload protection and send a signal to each actuator on the network to stop." This representation is false. The Electrak HD contains a

fundamental design limitation such that when one actuator encounters a resistance or failure and stops, it may fail to communicate a stop command to its paired actuator.

97. This failure results in unsynchronized movement. Just like the main actuator cannot communicate to stop its pair, a machine operator also is unable to manually stop the motion from continuing. This leads to a "runaway actuator" condition where the non-failed actuator continues to move uncontrollably until it reaches the end of travel or its own overload limit.

98. The runaway condition causes significant physical damage to the actuator and its host equipment, including bending, twisting, and misalignment. The synchronization failure also poses serious safety hazards for equipment operators.

99. In one instance, when a defective Electrak HD left one Clubhouse trailer operator with a twisted ramp and no ability to close the trailer, the operator dislocated his shoulder in an attempt to manually release the jammed actuator, causing the heavy metal ramp to come down on his body.

100. The Electrak HD actuator's synchronization feature does not provide continuous communication between actuators. Instead, the units only communicate at the beginning and end of a cycle. During motion, an actuator may halt when it exceeds capacity—or the communication cable between the pair can be disconnected—and the subordinate actuator's movement continues without feedback from the primary actuator.

101. Every Electrak HD actuator shares this common, uniform defect.

**Defendants Market the Electrak HD**

102. Through their advertising, brochures, and product manuals, Defendants represented that they produced reliable and safe synchronized electric linear actuators. They also repeatedly

represented that the Electrak HD actuators provided reliable synchronized motion. Examples of Defendants' misrepresentations include:

a. An Electrak HD manual represented that the Electrak HD "includes a synchronization feature allowing two or more actuators to be synchronized."

b. Defendants represented in a published case study that "[t]he Electrak HD's onboard electronics, combined with CAN bus networking, ensure consistent and synchronized movement of the ramp actuators."

c. In a press release, Defendants represented: "Synchronization enables motion integration of up to four Electrak HD actuators. When multiple units with the synchronization option are installed, designers can take advantage of a more stable and potentially quicker lift, . . . and improved handling of uneven loads."

d. The same press release further stated: "By using multiple actuators, synchronization increases system movement speed more efficiently."

e. In a catalog, Defendants represented that the Electrak HD provides "[g]reater capability to synchronize operations among multiple actuators, including configurations of start-and-stop instruction."

f. In a press release, Defendants represented that, "[d]uring operation, [the Electrak HD's] system electronics detect speed changes that indicate load imbalances, thereby eliminating bouncing or other effects of imbalance."

g. Defendants published an eNews article that stated "the Electrak HD's synchronization option has helped maintain a constant speed of actuation even in the presence of alternative loads on the actuators," providing customers with "improved performance, functionality and safety."

h. Defendants represented online: "Thomson brand is recognized and trusted as the global leader in linear motion technology. Through trusted brand names we offer customers an unprecedented choice in selecting the right solution to match specific application requirements."

i. Defendants represented online that "Electrak HD's control features undergo thorough testing at Thomson to ensure your machines are prepared for countless application challenges – both expected and unexpected."

j. Defendants represented online that the linear motion products are "engineered with efficiency and reliability in mind."

k. Defendants represented in multiple catalogs that the Electrak HD "actuators provide years of dependable service in . . . challenging applications."

103. Over and over again Defendants represented that the Electrak HD actuators move in sync with the synchronization mode:



**Door/Hatch Lifts**

Utilizing synchronization for mobile lifting platforms on vehicles provides a robust, reliable solution without the complexity and maintenance requirements of a traditional hydraulic solution.

**Assembly Stations**

Placing the Electrak HD with synchronization into your ergonomic applications ensures a stable, effective lift for off-center or awkward loads.



**Solar Panels**

The Electrak HD is an industrial solution that can handle heavy loads – such as large solar panels – in rugged installations. These heavier loads, which would typically require structural support and larger actuation solutions, can be easily lifted with multiple HD actuators in sync.

**Automated Guided Vehicles**

Applications using automation can benefit from internal condition monitoring with every HD actuator. This keeps the actuators running within rated specification and shuts them down if temperatures rise, loads are exceeded or input voltage is insufficient.

104. These representations were false, misleading, and made to the public with the intent to induce purchases by consumers. The Electrak HD does not provide synchronized movement. When one Electrak HD actuator stops moving—whether because of overload or some other issue—the other actuators may keep moving. This is not synchronization. Moreover, Defendants did not provide a reliable electric linear actuator prepared for expected and unexpected application challenges. The Electrak HD actuator is not safe. And the Electrak HD cannot provide years of dependable service for challenging applications, or otherwise.

105. These statements were disseminated not only by Thomson but also by Defendant Regal. For example, after the acquisition, Regal permitted (or required) Thomson to add to Thomson's logo "A Regal Rexnord Brand" and continue to make the misrepresentations detailed above. In at least one instance, a linear actuators brochure, which included at-issue misrepresentations, provided *only* Regal email addresses as contact information. Regal's website promotes linear actuator products by sending users directly to the Thomson website, which

26

repeatedly advertises synchronization. Regal maintained a website which hosted promotional materials for the Electrak HD, including the promotional article written to highlight Clubhouse's application of the synchronized Electrak HDs. Regal also redistributed at least one brochure originally published in 2019 promoting the use and reliability of the Electrak HD.

106. Defendants failed to disclose that the Electrak HD was defective. They did not alert consumers to the defect in their marketing, their manuals, or their direct communications with consumers.

**Defendants Omit the Defect, Cease Distribution of the Electrak HD, and Release the Electrak HD 2**

107. Rather than disclosing the defect or issuing a recall, Defendants continued to sell the defective Electrak HD actuators while working on a replacement product.

108. Around June 2025, Defendants announced a "new iteration" of the Electrak HD, the Electrak HD 2. Defendants called the Electrak HD 2 an "enhanced synchronization option," explaining that this version utilized a "position-based" synchronization where a "constant heartbeat signal in each actuator maintains position awareness for all units."

109. Defendants advertised that the Electrak HD 2 offered "[t]rue synchronization" in that it was "position-based" rather than "speed-based" like its predecessor. With true synchronization, Defendants said, "[m]ovement will no longer be allowed on the remaining units if communication or power is lost on any connected unit."

110. In other words, Defendants have conceded that the original Electrak HD did not, in fact, offer *true* synchronization—contrary to its previous representations that the Electrak HD did offer such synchronization. Defendants sought to correct the defect in the original Electrak HD actuator through this second version. Along the way, however, Defendants never disclosed that the original Electrak HD lacked true synchronization or that it was defective.

111.    Rather than admit the existence of the defect, warn consumers of the defect, or issue a recall, Defendants have silently rolled out the Electrak HD 2. Defendants covered up the failure of the Electrak HD by labeling its capabilities as "speed-based" actuation, omitting the truth of the capabilities—that the product never functioned as promised.

112.    When a consumer navigates to the product page for the Electrak HD, Defendants have posted a message that the Electrak HD has "been replaced by [the Electrak HD 2] as we introduce the next version of Synchronous Control. This represents a significant advance in synchronous control abilities and we are excited to bring this new technology forward!" Defendants refer to the functional Electrak HD 2 components as "position-based" in an attempt to gloss over the truth that the Electrak HD's synchronization feature never worked as designed.

113.    To date, Defendants still refuse to admit the existence of the defect; have failed to warn consumers and the public about the defect; have not issued a recall; have not offered all consumers suitable repairs, remedial measures, modifications, or replacements free of charge; and have not offered to reimburse customers who incurred costs and damages relating to the defect.

**The Plaintiffs Have Been Injured**

114.    Defendants' conduct in manufacturing, installing, servicing, and selling the defective Electrak HD—conduct underlying their misrepresentations and omissions about the Electrak HD—harmed the Plaintiffs and proposed Class Members and caused actual damages.

115.    The Plaintiffs and the Class Members were deprived of the benefit of their bargain. The defective Electrak HDs were of a lesser standard, grade, and quality than Defendants represented. The Plaintiffs and the Class Members paid more for their Electrak HDs than they would have had Defendants disclosed the defect.

116. Defendants unjustly benefitted from putting a defective product on the market and charging a price premium based on their misrepresentations. Both the Plaintiffs and the Class Members were deprived of safe, defect-free Electrak HDs.

117. The Plaintiffs and the Class Members would not have purchased the Electrak HD, or would have paid significantly less, if not for these representations.

118. The Plaintiffs and Class Members have also suffered out-of-pocket damages, including (but not limited to) damages from paying for additional electric linear actuators.

119. The Plaintiffs bring this action on behalf of themselves and putative Class Members to recover damages for their lost benefit of the bargain and out-of-pocket expenses, and to obtain an injunction requiring Defendants to repair or replace the defective Electrak HDs, to prevent further misrepresentations about the Electrak HD defect, and to prevent the risk of future harms.

120. The Plaintiffs need functional and reliable electric linear actuators. They plan to purchase functional and reliable electric linear actuators. And they would like to purchase and use functional and reliable electric linear actuators from Defendants. But Plaintiffs will not purchase Defendants' electric linear actuators until they are assured that Defendants are enjoined from misrepresenting the qualities of their products.

**Defendants Breached Express Warranties**

121. Defendants sell, market, and service the Electrak HD with express warranties that assure buyers that the product is free from defects. The Electrak HD violates these warranties. Examples of Defendants' express warranties, in addition to those addressed in paragraph 102, include:

    a. Defendants warranted that "Electrak HD . . . actuators provide years of dependable service in . . . challenging applications."

b. Defendants warranted that "Electrak HD's control features undergo thorough testing at Thomson to ensure your machines are prepared for countless application challenges – both expected and unexpected."

c. Defendants warranted: "The Thomson brand is recognized and trusted as the global leader in linear motion technology. Through trusted brand names we offer customers an unprecedented choice in selecting the right solution to match specific application requirements."

d. Defendants warranted that their products possess "Quality That Moves You Forward" and that the products are "engineered with efficiency and reliability in mind."

e. Defendants warranted that the Electrak HD actuators are "Strong. Smart. Sturdy."

f. Defendants warranted that the Electrak HD's synchronization capabilities allow "[i]ntegrated movement of multiple end points."

g. Defendants warranted that "[u]tilizing synchronization for mobile lifting platforms on vehicles provides a robust, reliable solution without the complexity and maintenance requirements of a traditional hydraulic solution."

h. Defendants warranted that their products, including the Electrak HD, "help keep . . . power equipment running smoothly."

122. Absent these warranties, the Plaintiffs would not have purchased—or would have paid significantly less—for the actuators. The Plaintiffs did not intend to purchase unreliable electric linear actuators that were unable to move in synchronization or perform controlled stops when one actuator failed. The representations were thus a basis of their bargain.

30

123. Defendants have breached their express warranties. The Electrak HD is not dependable or reliable. The Electrak HD fails under normal conditions to work in synchronization and stop actuation in a failure.

124. As set out above, Plaintiffs suffered damages as a result of Defendants' breach of warranty. They lost out of the benefit of their bargain and suffered out-of-pocket losses as a result of the breach.

**Defendants Breached their Implied Warranty of Merchantability**

125. Defendants breached their implied warranty of merchantability.

126. A warranty that goods are merchantable is implied in all contracts for sale, so long as the seller is a merchant with respect to goods of that kind. To be merchantable, goods must be fit for their ordinary purposes.

127. A merchant is one who deals in goods of the kind sold or is otherwise one who holds itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or other intermediary who by occupation holds itself out as having such knowledge or skill.

128. Defendants are Electrak HD merchants because they regularly design, manufacture, and sell Electrak HDs and because they hold themselves out as having knowledge or skill peculiar to Electrak HDs. Thomson holds itself out as having "pioneered the development of advanced electric linear actuators, delivering efficient, long-life and value-driven solutions to countless applications" and advertises itself as a "Regal Rexnord Brand." Regal holds itself out as "a global powertrain and motion control solutions provider" and includes Thomson in its "family of brands."

129. The Electrak HDs are not fit for their ordinary purpose. Consumers purchase Electrak HDs to provide controlled, synchronized movement *and* to control that movement by

stopping in synchronization upon a failure of one or more actuators. The Electrak HD cannot reliably perform its ordinary purpose. Because the Electrak HD is defective, Defendants have breached their warranty of merchantability.

## IV. TOLLING OF THE STATUTE OF LIMITATIONS

**Discovery Rule Tolling**

130. Within the time period of any applicable statutes of limitations, the Plaintiffs and the Class Members could not have discovered, through the exercise of reasonable due diligence, that Defendants were concealing the defect and misrepresenting the safety and reliability of the Electrak HD.

131. Defendants have refused to issue a recall and the Plaintiffs and Class Members have no way of knowing about the defect until the Electrak HD is used. Even after the Electrak HD is used, the Plaintiffs and the Class Members have no ability to discover the actual nature of the defect and have been misled to believe there is no defect due to Defendants' active concealment of the defect.

132. For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

**Fraudulent Concealment Tolling**

133. All applicable statutes of limitations have also been tolled by Defendants' active fraudulent concealment and denial of the defect throughout the time period relevant to this action.

134. Upon information and belief, Defendants were aware of the defect through consumer complaints, repair personnel complaints, warranty returns, and pre- and post-production testing and investigations.

32

135. Despite this awareness, Defendants refused to disclose the nature of the defect and/or misrepresented the cause of the failures to consumers, distributors, and other service providers.

136. Defendants are under a continuing duty to disclose the true nature of the character, quality, and nature of the defect to the Plaintiffs and the Class Members. Defendants did not disclose information about the defect and instead concealed the defect.

137. The Plaintiffs and the Class Members reasonably relied on Defendants' omissions and concealment when they purchased, continued to purchase, and serviced the Electrak HD.

138. Due to their fraudulent concealment, Defendants are estopped from relying on any defense based on statutes of limitations.

**Estoppel**

139. Defendants are under a continuous duty to disclose to the Plaintiffs and the Class Members the true character, quality, and nature of the Electrak HD and the defect. Instead, they concealed the defect.

140. The Plaintiffs and the Class Members reasonably relied upon Defendants' concealment when they purchased, continued to purchase, and serviced the Electrak HD. Defendants are thus estopped from relying on any defense based on statutes of limitations.

## V. CLASS ALLEGATIONS

**Class Definitions**

141. The Plaintiffs bring this action on their own behalves, and on behalf of all persons similarly situated, under Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and

superiority requirements of those provisions. The Plaintiffs seek to certify the following proposed nationwide class and state subclass, collectively referred to as "Class Members":

***The Nationwide Class:***

All persons in the United States and Puerto Rico who purchased one or more Electrak HDs manufactured by Defendants or any of their subsidiaries or affiliates within the statute of limitations.

***The Wisconsin Subclass:***

All persons who, after Regal acquired Thomson in 2023, purchased one or more Electrak HDs manufactured by Defendants or any of their subsidiaries or affiliates within the statute of limitations.

142. Excluded from each class are (1) Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; (2) Class Counsel and their employees; and (3) the judicial officers and their immediate family members and associated court staff assigned to this case. Claims for any personal physical injuries related to the defect are also excluded.

143. The Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

144. The Plaintiffs also reserve the right to seek the certification of classes with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4), including nationwide issues relating to unjust enrichment and breach of warranty claims.

145. Certification of the Plaintiffs' claims for class-wide treatment is appropriate because the Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove these elements in individual actions alleging the same claims.

**Numerosity**

146. This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are hundreds of consumers nationwide who purchased Electrak HDs.

147. The identity of Class Members is ascertainable and can be easily identified through the records of Defendants, their sales representatives, and their distributors. The Plaintiffs anticipate providing appropriate notice to each certified class in compliance with Federal Rules of Civil Procedure 23(c)(2)(A) or (B), to be approved by the Court after class certification, or as ordered by the Court under Federal Rule of Civil Procedure 23(d).

**Commonality**

148. This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class Members. The predominating common questions include (among other things):

a. whether, due to the defect, the Electrak HD fails to properly work in synchronization;

b. whether, due to the defect, the Electrak HD fails to properly communicate a stop signal to other Electrak HDs;

c. whether (and when) Defendants learned of the defect;

d. whether there were other commercially viable options to cure the defect;

e. whether Defendants provided sufficient warnings of the risks and nature of the defect;

f. whether Defendants engaged in unfair, deceptive, or unlawful acts or practices by failing to disclose the defect and misrepresenting the nature and quality of the Electrak HD;

g. whether Defendants made misrepresentations and omissions in their advertisements, brochures, product manuals, and other communications (including those about synchronization);

35

h.  whether a reasonable consumer likely would be misled by Defendants' misrepresentations and omissions;

i.  whether Defendants created express warranties through their statements about the Electrak HD;

j.  whether Defendants breached those express warranties by designing, manufacturing, distributing, or selling Electrak HDs that are unreliable and defective;

k.  whether Defendants breached their implied warranty of merchantability by designing, manufacturing, distributing, or selling Electrak HDs that are unreliable and defective;

l.  whether the Plaintiffs and the Class Members overpaid for their Electrak HDs because of Defendants' misrepresentations and omissions;

m.  whether the Plaintiffs and the Class Members suffered damages as a result of Defendants' refusal to repair or replace the defective Electrak HDs; and

n.  whether damages, restitution, equitable, injunctive, declaratory, or other forms of relief are warranted.

**Typicality**

149.   This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3) because the Plaintiffs' claims are typical of the claims of each of the Class Members, as all Class Members were and are similarly affected and their claims arise from Defendants' same wrongful conduct. Each Class Member purchased a defective Electrak HD and (as a result) has sustained—and will continue to sustain—damages in the same manner as the Plaintiffs. The relief the Plaintiffs seek in this action is typical of the relief sought for the absent Class Members.

**Adequacy of Representation**

150.   The Plaintiffs are adequate representatives under Federal Rule of Civil Procedure 23(a)(4). The Plaintiffs will fairly and adequately protect the interests of the Class Members. The Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or

36

conflict between or among the Plaintiffs and the unnamed Class Members. The Plaintiffs anticipate no difficulty managing this case as a class action.

151. To prosecute this case, the Plaintiffs have chosen the undersigned law firms, who have substantial experience in prosecuting large and complex class actions and have the financial resources to meet the costs associated with the vigorous prosecution of this type of case. The Plaintiffs and their counsel will fairly and adequately protect the interests of all Class Members.

**Superiority/Predominance**

152. This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class Members. The joinder of individual Class Members is impracticable because of the vast number of Class Members who own defective Electrak HDs.

153. Because the monetary damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation by even a small fraction of the Class Members would be enormous.

154. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class Member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation. Class adjudication is simply superior to other alternatives under Federal Rule of Civil Procedure 23(b)(3)(D).

155. The Plaintiffs are unaware of any obstacles likely to be encountered in managing this case that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on the Plaintiffs' motion or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Federal Rule of Civil Procedure 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and employ Federal Rule of Civil Procedure 23(c)(5) to divide any Class into Subclasses.

### Requirements of Federal Rule of Civil Procedure 23(b)(2)

156. Defendants have acted or failed to act in a manner generally applicable to the Class Members in the Nationwide Class and the Wisconsin Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

### VI. CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### ("WDTPA"), Wis. Stat. § 100.18
### against all Defendants
### on behalf of the Plaintiffs, the Nationwide Class, and the Wisconsin Subclass

157. The Plaintiffs incorporate by reference paragraphs 1 through 156 as though set forth herein.

158. The WDTPA provides: "No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute . . . merchandise . . . shall make, publish,

disseminate, circulate, or place before the public . . . an advertisement . . . which advertisement contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

159. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass are members of "the public" within the meaning of WDTPA. Wis. Stat. § 100.18(1).

160. Defendants engaged in unfair and deceptive trade practices that violated WDTPA, including (but not limited to) the following:

   a. Defendants represented that the Electrak HDs have characteristics that they do not have;

   b. Defendants represented that the Electrak HDs are of a particular standard, quality, or grade, when they are not;

   c. Defendants represented that the Electrak HDs can work in synchronized actuation, when they cannot;

   d. Defendants represented that the Electrak HDs working in synchronization can communicate a signal upon failing to stop the paired actuators, when they cannot;

   e. Defendants misrepresented the existence and the true nature of the defect; and

   f. Defendants failed to disclose the existence of the defect, even though they knew that such information was material to consumers, rendering their affirmative representations misleading.

161. Defendants' unfair or deceptive acts or practices—including misrepresenting the Electrak HD's capabilities and omitting material facts about the defect—had a tendency or capacity to deceive; tended to create a false impression in consumers; and were likely to materially mislead reasonable consumers, including the Plaintiffs, the Nationwide Class Members and the Wisconsin Subclass Members, about the characteristics and reliability of the Electrak HD, the quality of the Thomson brand, and the true value of the Electrak HDs.

39

162. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members had no reasonable way to know that the Electrak HDs were defective and posed a safety hazard. Defendants possessed a superior understanding as to the quality and characteristics of the Electrak HDs. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members had no reason to believe that the Electrak HDs were defective. Any reasonable consumer would have relied on Defendants' misrepresentations and omissions.

163. Defendants misrepresented and omitted material facts about the Electrak HDs and the defect, and Defendants misled the Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members.

164. Several of the misrepresentations, including certain references in paragraph 102 originated from Defendants in Wisconsin. Defendant Regal is headquartered in Milwaukee, Wisconsin, and since the 2023 Merger, Thomson operates as a Regal Rexnord brand with marketing activities controlled, established, and disseminated from and through Wisconsin.

165. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members were injured as a result of Defendants' conduct because the Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members paid to own Electrak HDs that offered true synchronization capabilities and instead received and overpaid for a defective product. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members paid a premium for their Electrak HDs. The market would not have supported such high prices absent Defendants' misrepresentations. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members also suffered out-of-pocket losses in paying to replace their defective Electrak HDs.

166. Defendants' misrepresentations and omissions were material to the Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members. An electric linear actuator

made by a reputable manufacturer of safe and functional electric linear actuators are worth more than an otherwise comparable electric linear actuator made by a disreputable manufacturer of dysfunctional electric linear actuators.

167. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members have suffered ascertainable losses as a result of Defendants' misrepresentations and failure to disclose information about the defect. Had they been aware of the defect, the Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members either would have paid less for their Electrak HDs or would not have purchased the Electrak HDs at all. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members did not receive the benefit of their bargain due to Defendants' misconduct.

168. As a direct and proximate result of Defendants' violations of WDTPA, the Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members have suffered an injury-in-fact and actual damages.

169. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members are entitled to recover their actual damages, including out-of-pocket losses from replacing their Electrak HDs and economic damages at the point of sale equal to the difference between the value of the Electrak HDs as promised and the value of the Electrak HDs as delivered. *See* Wis. Stat. § 100.18(11)(b). The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members are also entitled to recover their attorneys' fees. *See id.*

170. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members are also entitled to injunctive relief.

171. The Plaintiffs, the Nationwide Class Members, and the Wisconsin Subclass Members have also suffered and will continue to suffer irreparable harm if Defendants continue to engage in deceptive, unfair, and unreasonable practices.

172. The Plaintiffs, on behalf of the Nationwide Class Members and the Wisconsin Subclass Members, request that the Court award them actual damages, declare that Defendants' conduct violates WDTPA, issue an order requiring Defendants to notify the Nationwide Class Members and Wisconsin Subclass Members of the defect and repair or replace the defective Electrak HD, and award the Plaintiffs', the Nationwide Class Members', and Wisconsin Subclass Members' attorneys' fees. The Plaintiffs also request any other just and proper relief available under WDTPA.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**against all Defendants**
**on behalf of the Plaintiffs, the Nationwide Class, and the Wisconsin Subclass**

173. The Plaintiffs incorporate by reference paragraphs 1 through 156 as though set forth herein.

174. The Plaintiffs bring this breach of express warranty claim on behalf of the members of the Nationwide Class, and the members of the Wisconsin Subclass, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against Defendants under the laws of one or both of Defendants' home states or the states where the Plaintiffs and the Class Members purchased their Electrak HDs, as applicable.

175. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass each purchased an Electrak HD.

42

176. Defendants made affirmations of facts and promises to the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass that related to the goods. For example, as set out above, Defendants repeatedly represented that the Electrak HD offers "synchronized actuator motion" and that the Electrak HDs "provide years of dependable service."

177. Defendants made these representations directly to consumers through their advertising, brochures, manuals, communications, and other public materials. Defendants' representations were directed to purchasers. Defendants were thus in privity with the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass.

178. Nonetheless, privity is not required here because the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass are intended third-party beneficiaries of warranties between Defendants and their agents. The express warranties are directly and primarily intended to protect and inform consumers, not distributors. It is a consumer who ultimately relies on Defendants' representations. And when a product fails, it is the consumer that needs Defendants to repair, replace, or pay for the defective Electrak HD. Distributors would have no need for such warranties because they do not install or use the Electrak HDs for themselves.

179. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass trusted these representations and relied on them. The representations became part of the basis of their bargain. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass would not have purchased the Electrak HDs—or would have paid significantly less for their Electrak HDs—had they known that the Electrak HDs were unreliable and defective.

180. Defendants breached their warranties. Defendants' representations about the Electrak HDs were false. For example, the Electrak HD is not dependable, is not reliable, and is not able to properly work or fail in synchronization. The Electrak HD fails to communicate a stop command when it is working in synchronization and one pair fails.

181. Defendants are on notice of the defect. The Plaintiffs notified Defendants directly about the failures of the Electrak HD. Defendants knew or should have known about the defect before they sold the Electrak HDs. Defendants thus had a reasonable opportunity to cure the defect.

182. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass were injured because of Defendants' breaches. Had they been aware of the defect, the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass either would have paid less for their Electrak HDs or would not have purchased the Electrak HDs at all. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass did not receive the benefit of their bargain due to Defendants' breaches.

183. To the extent Defendants have tried to limit their warranties, any such attempt would be unenforceable. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass did not agree to (or bargain for) any limitation on Defendants' express warranties. Any limitation on those express warranties would be unconscionable. And any limited warranty would fail of its essential purpose because the defect was latent in that consumers could not detect the defect until the Electrak HDs failed.

184. As a direct and proximate result of Defendants' breaches of their express warranties, the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass were injured and are therefore entitled to actual damages, including out-of-pocket losses from replacing their Electrak HDs and economic damages at the point of sale equal to the

difference between the value of the Electrak HD as promised and the value of the Electrak HD as delivered.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**
**against all Defendants**
**on behalf of the Plaintiffs, the Nationwide Class, and the Wisconsin Subclass**

185. The Plaintiffs incorporate by reference paragraphs 1 through 156 as though set forth herein.

186. The Plaintiffs bring this breach of implied warranty claim on behalf of the members of the Nationwide Class, and the members of the Wisconsin Subclass, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against Defendants under the laws of one or both of Defendants' home states or where the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass purchased their Electrak HDs, as applicable.

187. An implied warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. For goods to be merchantable, they must at least be fit for the ordinary purposes for which such goods are used.

188. A merchant is one who deals in goods of the kind sold or is otherwise one who holds itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or other intermediary who by occupation holds itself out as having such knowledge or skill.

189. Defendants are Electrak HD merchants because they regularly design, manufacture, and sell Electrak HDs and because they hold themselves out as having knowledge or skill peculiar to Electrak HDs. Thomson holds itself out as having "pioneered the development of advanced

45

electric linear actuators, delivering efficient, long-life and value-driven solutions to countless applications" and advertises itself as a "Regal Rexnord Brand." Regal holds itself out as a "a global powertrain and motion control solutions provider" and includes Thomson in its "family of brands."

190. The Electrak HDs are not fit for their ordinary purpose. Consumers purchase Electrak HDs to provide controlled, synchronized movement *and* to control that movement by stopping in synchronization upon a failure of one or more actuators. The Electrak HD cannot reliably perform its ordinary purpose. Because the Electrak HD is defective, Defendants have breached their warranty of merchantability.

191. Defendants, as well as all other businesses in the Electrak HD supply chain, are on notice of the defect. For example, Plaintiff Clubhouse notified Defendants directly about the failures of the Electrak HD. Despite repeated notice of the defect, Defendants have failed to remedy the issue within a reasonable time or within a reasonable number of attempts.

192. To the extent Defendants have tried to exclude or modify their implied warranty of merchantability, that exclusion or modification is unenforceable. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass did not agree to (or bargain for) a limitation on Defendants' implied warranties. In any event, Defendants never mentioned the implied warranty of merchantability, provided no conspicuous writing disclaiming the implied warranty of merchantability, and have otherwise failed to exclude or modify the implied warranty of merchantability.

193. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass were the intended consumers of the Electrak HD and Defendants' implied warranties were intended to benefit the consumers and not the distributors, thereby establishing privity of contract.

194.     Nonetheless, privity is not required here because the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass are intended third-party beneficiaries of the contracts—and, specifically, the warranties—between Defendants and their agents. The warranties are directly and primarily intended to protect end-consumers, not distributors. When a product fails, it is the end-consumer that needs Defendants to repair, replace, or pay for the defective Electrak HD. Distributors would have no need for such warranties because they do not install or use the Electrak HDs for themselves.

195.     As a direct and proximate result of Defendants' breaches of the implied warranty of merchantability, the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass were injured and are therefore entitled to actual damages, including out-of-pocket losses from replacing their Electrak HDs and economic damages at the point of sale equal to the difference between the value of the Electrak HD as promised and the value of the Electrak HD as delivered.

**COUNT IV**
**UNJUST ENRICHMENT**
**against all Defendants**
**on behalf of the Plaintiffs, the Nationwide Class, and the Wisconsin Subclass**

196.     The Plaintiffs incorporate by reference paragraphs 1 through 120 and 130 through 156 as though set forth herein.

197.     The Plaintiffs bring this unjust enrichment claim in the alternative to any contractual claims.

198.     The Plaintiffs bring this claim on behalf of the members of the Nationwide Class and the members of the Wisconsin Subclass under the common law of unjust enrichment, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against Defendants under the laws of one

47

or both of Defendants' home states or where the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass purchased their Electrak HDs, as applicable.

199. Defendants have received and retained a benefit from the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass and inequity has resulted.

200. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass directly conferred benefits on Defendants: the difference between the price paid for a non-defective Electrak HD (as advertised) and the value of a defective Electrak HD that did not work safely or effectively (as received).

201. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass paid a price premium for the Electrak HD because of Defendants' representations that the Electrak HD was safe and fit for ordinary use. The Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass would not have purchased the Electrak HD, or would have paid significantly less, if not for these representations.

202. Defendants benefited through their unjust conduct by selling Electrak HDs at a profit and for more than the Electrak HD were worth. Defendants also benefited from their unjust conduct in refusing to recall and repair the Electrak HDs and, thus, saving that cost.

203. Defendants were aware that they were charging a premium for their product. Defendants were aware that they were receiving a benefit they were not entitled to.

204. It would be inequitable for Defendants to retain these benefits. Defendants will be unjustly enriched if they are allowed to retain the benefits.

205. The Plaintiffs do not have an adequate remedy at law.

206. Each of the Plaintiffs, the members of the Nationwide Class, and the members of the Wisconsin Subclass are entitled to recover the amount by which Defendants were unjustly enriched at his or her expense.

207. Alternatively, the amount of Defendants' unjust enrichment should be disgorged, in an amount to be proven at trial.

208. The Plaintiffs, on behalf of themselves and all similarly situated members of the Nationwide Class and the members of the Wisconsin Subclass, seek an award against Defendants in the amount by which they have been unjustly enriched at the Plaintiffs', the members of the Nationwide Class's, and the members of the Wisconsin Subclass's expense, and such other relief as this Court deems just and proper.

**COUNT V**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**("Magnuson-Moss"), 15. U.S.C. § 2301, et seq.**
**against all Defendants**
**on behalf of Plaintiff Madison Scouts and the Nationwide Class**

209. Plaintiff Madison Scouts incorporates by reference paragraphs 1 through 156 as though set forth herein.

210. Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers who, among other things, fail to comply with the terms of written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1). As alleged above, Defendants failed to comply with the terms of their written, express, or implied warranties.

211. The Electrak HD actuators are "consumer products" as defined by Magnuson-Moss because the Electrak HDs are tangible personal property distributed in commerce for personal, family, or household purposes. *See* 15 U.S.C. § 2301(1).

49

212.    Plaintiff Madison Scouts and the members of the Nationwide Class are "consumers" as defined by Magnuson-Moss because they are buyers of the Electrak HD actuators, transferees of the product during the duration of the warranties, or entitled by the terms of the warranty or state law to enforce the warranties. *See* 15 U.S.C. § 2301(3).

213.    Thomson is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)-(5). Thomson is a supplier because it is engaged in making the Electrak HDs directly or indirectly available to consumers. Thomson is a warrantor because it has given a written warranty or may be obligated under an implied warranty.

214.    Regal is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)-(5). Regal is a supplier because it is engaged in making the Electrak HDs directly or indirectly available to consumers. Regal is a warrantor because it has given a written warranty or may be obligated under an implied warranty.

215.    The Defendants breached their express warranties. The Defendants made affirmations of facts and promises to Plaintiff Madison Scouts and the members of the Nationwide Class that related to the goods. For example, as set out above, Defendants repeatedly represented that the Electrak HDs have a "synchronization option that is built into the actuators" and that the "actuators provide years of dependable service in . . . challenging applications."

216.    The Defendants made these representations directly to consumers through their advertising, brochures, manuals, and other public materials. The Defendants' representations were directed to end-purchasers.

217.    Plaintiff Madison Scouts and the members of the Nationwide Class trusted these representations and relied on them. The representations became part of the basis of their bargain. Plaintiff Madison Scouts and the members of the Nationwide Class would not have purchased the

Electrak HDs—or would have paid significantly less for their Electrak HDs—had they known that the Electrak HDs were unreliable and defective.

218. The Defendants breached their express warranties. Their representations about the Electrak HDs were false. For example, the Electrak HDs do not provide dependable synchronization and do not work in challenging applications.

219. The Electrak HDs are not fit for their ordinary purpose. Consumers purchase Electrak HDs to work in synchronization and effectively terminate movement upon failure or overload. The Electrak HDs cannot reliably perform these ordinary purposes. Defendants have thus breached their implied warranty of merchantability.

220. Defendants, as well as all other businesses in the Electrak HD supply chain, are on notice of the defect. Plaintiffs notified Defendants directly and through the Defendants' distributors of the defect. Defendants knew or should have known about the defect before they sold the Electrak HDs. Defendants thus had a reasonable opportunity to cure the defect.

221. Plaintiff Madison Scouts and the members of the Nationwide Class were injured because of the Defendants' breaches. Had they been aware of the defect, Plaintiff Madison Scouts and the members of the Nationwide Class either would have paid less for their Electrak HDs or would not have purchased the Electrak HDs at all. Plaintiff Madison Scouts and the members of the Nationwide Class did not receive the benefit of their bargain due to Defendants' breaches.

222. To the extent Defendants have tried to limit their express warranties, any such attempt would be unenforceable. Plaintiff Madison Scouts and the members of the Nationwide Class did not agree to (or bargain for) any limit to Defendants' express warranties. Any limitation on those express warranties would be unconscionable. And any limited warranty would fail of its

essential purpose because the defect was latent in that consumers could not detect the defect until the Electrak HDs failed.

223. The Defendants knew that the Electrak HDs were defective and posed safety risks, and that the Electrak HDs would continue to pose safety risks. Defendants failed to disclose the defect to Plaintiff Madison Scouts and the members of the Nationwide Class. And so Defendants' enforcement of any durational limitations on warranties is unlawful.

224. Plaintiff Madison Scouts and the members of the Nationwide Class were the intended consumers of the Electrak HDs and Defendants' warranties were intended to benefit consumers and not the distributors, thereby establishing privity of contract.

225. Nonetheless, privity is not required here because Plaintiff Madison Scouts and the members of the Nationwide Class are intended third-party beneficiaries of the contracts—and, specifically, the warranties—between the Defendants and their agents. The warranties are directly and primarily intended to protect end-consumers, not distributors. When a product fails, it is the retailer or end-consumer that needs the Defendants to repair, replace, or pay for the defective Electrak HDs. Distributors would have no need for such warranties because they do not install or use the Electrak HDs for themselves.

226. The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25. The amount in controversy also meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

227. Plaintiff Madison Scouts and the members of the Nationwide Class have suffered, and are entitled to recover, damages as a result of Defendants' breaches of warranty and violations of Magnuson-Moss.

228. Defendants had an opportunity to disclose information concerning the Electrak HDs' inability to perform as warranted, and to cure their breach of warranty. But Defendants have failed to do so.

229. As a direct and proximate result of Defendants' conduct, Plaintiff Madison Scouts and the members of the Nationwide Class have suffered damages and continue to suffer damages, including out-of-pocket losses from replacing their Electrak HDs and economic damages at the point of sale equal to the difference between the value of the Electrak HDs as promised and the value of the Electrak HDs as delivered.

230. Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(l). Rescission and revocation of acceptance are equitable remedies available to Plaintiff Madison Scouts and the members of the Nationwide Class under Magnuson-Moss.

231. Plaintiff Madison Scouts also seeks, under Magnuson-Moss, an award of costs and expenses (including attorneys' fees) to prevailing consumers in connection with the commencement and prosecution of this action. See 15 U.S.C. § 2310(d)(2). Plaintiff Madison Scouts and the members of the Nationwide Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## PRAYER FOR RELIEF

The Plaintiffs, on behalf of themselves and all other similarly situated Class Members, request that the Court enter judgment against Defendants as follows:

(1) Declare this action to be a proper class action maintainable under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint the Plaintiffs as Class and Subclass representatives and the Plaintiffs' chosen counsel as Class Counsel;

(2) Declare that the Electrak HDs are defective;

(3) Declare that Defendants are financially responsible for notifying all Class Members about the defect, issuing a recall for the Electrak HDs, and replacing (at their cost) each Electrak HD in the market;

(4) Declare that Defendants' conduct is unlawful, unfair, or deceptive and issue an order permanently enjoining Defendants from continuing the unlawful, deceptive, and unfair business practices alleged in this action;

(5) Declare that Defendants must disgorge, for the benefit of the Plaintiffs and the Class Members, all or part of the ill-gotten gains they received from the sale of Electrak HDs, or make full restitution to the Plaintiffs and the Class Members;

(6) Award the Plaintiffs and the Class Members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under the applicable claims;

(7) Award the Plaintiffs and the Class Members their reasonable attorneys' fees and costs, as allowed by law;

(8) Award the Plaintiffs and the Class Members pre-judgment and post-judgment interest as provided by law; and

(9) Award the Plaintiffs and the Class Members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a jury trial for any and all issues triable by a jury.

Respectfully submitted: June 2, 2026.

<table>
<tr><td>

/s/ *Tal J. Lifshitz*
Tal J. Lifshitz, Esq.
Florida Bar No. 99519
tjl@kttlaw.com
Brandon M. Sadowsky, Esq.
New York Bar No. 5732847
bsadowsky@kttlaw.com
Lindsey E. Graham, Esq.
Florida Bar No. 1069593
lgraham@kttlaw.com

**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

*Counsel for Plaintiffs*

</td><td>

CARLOS E. SILVA, ESQ.
(*admission pending*)
Florida Bar No.: 999032
csilva@silvasilva.com
BENJAMIN FERNANDEZ IV, ESQ.
(*admission pending*)
Florida Bar No.: 63881
bfernandez@silvasilva.com
OLIVER SILVA, ESQ.
(*admission pending*)
Florida Bar No.: 1024669
osilva@silvasilva.com

**SILVA & SILVA, P.A.**
236 Valencia Avenue
Coral Gables, Florida 33134
Tel: 305.445.0011
Fax: 305.445.1181

*Counsel for Plaintiffs*

</td></tr>
</table>